UNITED STATES BANKRUPTCY COURT
FOR THE
DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
In re
**CAMERON CONSTRUCTION &**
**ROOFING CO., INC.,**                           Chapter 7
    Debtor                                    Case No. 14-13723-JNF
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
**DONALD R. LASSMAN, Chapter 7 Trustee**,
    Plaintiff,
v.                                               Adv. P. No. 15-1121
**CAMERON CONSTRUCTION LLC**,
    Defendant
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

### I. INTRODUCTION

The matter before the Court is the two-count Complaint filed by the Chapter 7 Trustee of the bankruptcy estate of Cameron Construction & Roofing Co., Inc. (the "Debtor") against Cameron Construction LLC (the "Defendant"). Through his Complaint, Donald R. Lassman, the Chapter 7 Trustee, seeks to "(a) disregard the corporate form of . . . [the] Defendant . . . ; and (b) preserve the assets of the Defendant for distribution to the creditors of the Debtor's estate." The Defendant filed an Answer, and the parties filed a Joint Pretrial Memorandum in which, among other things, they set forth admitted facts and identified their respective factual and legal positions.

The Court conducted a trial on November 2, 2016 at which two witnesses testified and 16 exhibits were accepted into evidence. The Court now makes its findings of fact and rulings of law in accordance with Fed. R. Bankr. P. 7052. The Trustee's action is

1

within the jurisdiction of this Court pursuant to 28 U.S.C. § 1334, as it relates to the Debtor's bankruptcy case under title 11 of the United States Code. The parties consent to entry of a final judgment by this Court.

## II. FACTS

### A. Background[1]

The Debtor filed a Chapter 7 petition on August 5, 2014 together with Schedules and a Statement of Financial Affairs and other required documents. Donald R. Lassman, Esq. was appointed the Chapter 7 Trustee. On Schedule A-Real Property, the Debtor did not list any ownership interests in real property, and, on Schedule D-Creditors Holding Secured Claims, it did not list any secured creditors. It listed modest priority debt on Schedule E-Creditors Holding Unsecured Priority Claims and claims totaling approximately $176,000 on Schedule F-Creditors Holding Unsecured Nonpriority Claims.[2] On Schedule H-Codebtors, the Debtor listed the estate of Wilfred G. Cameron as "a possible guarantor of various corporate debts." In response to question 21b on the Statement of Financial Affairs, which requires disclosure of "all officers and directors of the corporation, and each stockholder who directly or indirectly owns, controls, or holds

---

[1] The Court may take judicial notice of its own docket. *See* LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.), 196 F.3d 1, 8 (1st Cir. 1999) ("The bankruptcy court appropriately took judicial notice of its own docket.").

[2] The Court's claims register reflects the filing of claims totaling $257,306, comprised in part of secured claims totaling $10,610.06 and priority claims totaling $2,783.67. To date, the Trustee has not objected to any claims.

5 percent or more of the voting or equity securities of the corporation," the Debtor listed the following:

| NAME AND ADDRESS | TITLE | NATURE AND PERCENTAGE OF STOCK OWNERSHIP |
|---|---|---|
| Wilfred G Cameron, Deceased C/O Diann Sutcliffe, Special Administrator 1040 County St Attleboro, MA 02703 | Special Administrator | 99% Ownership of Corporation |

Diann Sutcliffe signed the petition and Statement of Financial Affairs in her capacity as "Special Representative."

B. <u>Agreed Facts</u>[3]

Until his death, Wilfred Cameron ("Cameron") was the majority owner and controlled both the Debtor and the Defendant. The Debtor's assets prior to the bankruptcy filing were primarily tools and vehicles utilized in its roofing business. The primary asset of the Defendant is the property located at: 68 Falmouth Street, Attleboro, Massachusetts (the "Property").

The Parties never entered into a lease agreement for the Debtor's use of the Property.

The Debtor employed approximately 15 employees between 2011 and 2013; the Defendant employed approximately 17 employees during the same period. Both the Debtor and the Defendant issued W-2's to their employees. The Debtor would have paid

---

[3] The Court paraphrases the admitted facts.

higher premiums for worker's compensation insurance if it employed the Defendant's workers.

The Debtor and the Defendant each filed annual reports with the Secretary of the Commonwealth. Neither entity produced any other corporate records including shareholder/member meeting minutes, votes or resolutions.

The Debtor transferred funds to the Defendant and labeled those transfers in its tax returns as "rent." The Property currently is being rented for $1,500 per month.

The Defendant did not issue invoices for the work its employees performed for the benefit of the Debtor. The Debtor and Defendant did not enter into any written subcontractor agreements for services the Defendant's employees performed on behalf of the Debtor.

The funds paid to the Defendant by the Debtor were characterized as rent on the Defendant's tax returns, and other places on the tax returns referred to labor and materials for work done by the Defendant's employees. The Defendant's tax return shows as its business activity: "Property management, rental and [con]struction." The Defendant's tax returns, while showing receipt of rental income, also reflect significant wages paid to its employees beginning in 2011 in the amount of $142,703.00 and similar amounts for the following years. The 2012 tax return for the Defendant shows significant wages paid by the Defendant in the amount of approximately $117,037.00. The 2013 tax return for the Defendant show wages and salaries of $87,088.00.

Cameron's spouse, Jennifer Cameron, worked no more than 20-30 hours per week during the time in question, performing billing, bookkeeping and similar tasks. In 2011, she was paid $77,500 ($70,000 by the Defendant and $7,500 by the Debtor).

C. <u>Evidence Adduced at Trial</u>

The Debtor was organized in November of 2000. The Articles of Organization identified Cameron as President, Treasurer, Clerk and sole Director. The Debtor filed an Annual Report with the Secretary of the Commonwealth, Corporations Division, in 2001 and in succeeding years through 2012.

The Defendant, a limited liability company, was formed in 2002 with two members. Cameron was the manager and 99.9% owner having contributed $108,000 and the Debtor was a 1% owner having contributed $12,000. Cameron and the Debtor, through its President, Cameron, executed an Operating Agreement on June 17, 2002. Attorney James Lewis prepared the documents required to form the Defendant. On June 21, 2012, the Defendant acquired the Property. Attorney Lewis explained the rationale for forming the Defendant, testifying as follows:

> I would say that it is typical in the real estate and business bar that when you have an operating company operating out of a site and they acquire that site, you typically would have a second entity formed. So that would be just typical, in my experience, in this regard, but in this case, there was -- an even overreaching or overarching reason. And that is if this property is surrounded by sites -- hazardous waste sites, and it's in a highly industrialized area of Attleboro, and so I advised Mr. Cameron that it would be foolhardy to take that -- take title in anything other than a separate entity, and I chose to recommend to him an LLC.

The Defendant filed Annual Reports with the Secretary of the Commonwealth in 2005 and in each succeeding year through 2012.[4] In its first Annual Report it stated, consistent with the purpose set forth in the Operating Agreement, that its purpose was "to engage in the business of owning, managing and developing real estate and to engage in any activities directly or indirectly related to or incidental thereto."

The Defendant employed between five and seventeen workers in 2001, 2012 and 2013. Its employees performed services for the Debtor. Its workers' compensation premiums were significantly less than the premiums paid by the Debtor, who employed approximately fifteen workers during the same period. In addition, the Debtor paid "rent" to the Defendant, although the parties did not have a written lease agreement and the amount of "rent" paid far exceeded the fair rental value of the property. The following charts summarize information available from the federal tax returns for the Debtor and the Defendant for tax years 2011 through 2013 as well as information from W-2s.

| Entity | Rent (Paid by Debtor/Received by Defendant) | Salaries and Wages | W-2s |
|---|---|---|---|
|  |  |  |  |
| Debtor 2011 | $176,500.00 | $ 57,402.00 |  |
| Debtor 2012 | $146,476.00 | $ 71,803.00 |  |
| Debtor 2013 | $113,599.00 | $ 75,223.00 |  |
| Defendant 2011 | $176,500.00 | $142,703.00 | $142,703.00 |
| Defendant 2012 | $148,634.00 | $117,037.00 | $115,500.80 |
| Defendant 2013 | $117,900.00 | $ 87,088.00 | $ 94,231.25 |

---

[4] Neither the Plaintiff nor the Defendant submitted Annual Reports for 2002, 2003 or 2004.

The following chart summarizes information available from the Debtor's federal tax returns:

| Assets/Liabilities | 2011 | 2012 | 2013 |
|---|---|---|---|
| Net Gross Receipts | $1,023,105 | $1,088,918 | $999,807 |
| Taxable Income | -$ 25,091 | -$ 52,259 | -$ 90,927 |
| Total Assets | $ 190,026 | $ 198,095 | $175,939 |
| Accounts Payable | $ 60,874 | $ 120,446 | $204,587 |
| Short term notes, etc. | $ 64,451 | $ 72,064 | $ 74,332 |
| Other Current Liabilities | $ 15,000 | $ 15,000 | $ 15,000 |
| Long term notes, etc. | $ 6,707 | $ -0- | $ -0- |

The following chart summarizes information available from the Defendant's federal tax returns:

| Assets/Liabilities | 2011 | 2012 | 2013 |
|---|---|---|---|
| Total Assets | $144,870 | N/A | $134,318 |
| Accounts Payable | $ 235 | N/A | $ 960 |
| Net Income (Loss) | -$ 3,900 | -$5,598 | -$ 5,679 |

The charts establish that the Debtor's liabilities exceeded its assets in 2012 and 2013 and that the Defendant had insignificant debt in relation to the value of its assets.

### III. POSITIONS OF THE PARTIES

A. The Trustee

The Trustee argues that the evidence presented satisfies the so-called My Bread Baking factors, see Attorney General v. M.C.K., Inc., 432 Mass. 546, 555-56, 736 N.E.2d 373, 380-81 (2000)(citing My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614, 619-20, 233 N.E.2d 748, 752 (1968)), such that the Debtor and Defendant should be treated as a single entity and the assets of the Defendant should be made available to the Trustee to

7

satisfy the debts and obligations of the Debtor. The Trustee points to common ownership and control of the Debtor and the Defendant by Cameron, who together with the Debtor owned the Defendant.  Noting that the Debtor received a 1% interest for its contribution of 10% of the capital invested in the Defendant, he states that "[t]he Debtor and Defendant truly blurred the lines between these two entities by comingling their business assets, their business purpose and particularly their respective workforces," adding that the Defendant's employees worked exclusively on the Debtor's jobs and the Debtor utilized the Defendant's space without a lease.  Relying upon the Defendant's business purpose set forth in the Operating Agreement and Annual Reports, namely "owning, managing and developing real estate and . . . engag[ing] in any activities directly or indirectly related or incidental thereto," the Trustee argues that the Defendant's employees' work was outside the scope of its stated business purpose.

The Trustee notes that funds transferred as "rent" were used to pay the salaries of the Defendant's employees who performed services exclusively for the Debtor, and the Defendant received no significant additional income from other sources.  He also points to the absence of a subcontract between the the Debtor and the Defendant regarding services provided by the Defendant's employees and the absence of invoices from the Defendant evidencing the work performed for the Debtor.[5]  Coupled with the admission that worker's compensation insurance premiums would have been higher if its

---

[5] Notably, the amount paid to Cameron's spouse was significant, nearly double the amount paid to the next highest paid employee for either company, representing nearly 50 percent of the total transfers to the Defendant for 2011.

8

employees worked for the Debtor, the Trustee reiterates his position that he has satisfied the <u>My Bread Baking</u> factors.

The Trustee also rejects the contention that the common business practice of creating separate entities for distinct purposes to shield assets of one entity from the creditors of another should apply because Cameron relinquished that protection by permitting the Debtor and the Defendant to ignore the Defendant's corporate purpose and using them for nearly identical purposes. He contends that the formality of separate tax returns and the filing by both entities of Annual Reports was just "window dressing" because the two entities operated as one using the Defendant's employees to perform work on jobs secured by the Debtor. In addition, he states that "[t]he location, tools and equipment were used by both companies interchangeably." Pointing to Cameron's spouse's salary from the Defendant, the Trustee contends that "the Debtor syphoned away its assets and created a loss on its tax return." He concludes that the Defendant and the Debtor "intermingle[ed] their assets, their employees and their corporate purpose and blurr[ed] the lines between entities in the process."

    B. <u>The Defendant</u>

The Defendant maintains that it is undisputed that the Debtor and the Defendant filed separate tax returns, that the Debtor filed Articles of Organization and the Defendant was properly formed; that each entity had separate employees and issued W-2s for them, and that the Debtor and the Defendant filed Annual Reports, emphasizing that "[t]hey filed corporate tax returns each year and received bills from their accountant and attorneys during the years in question."

9

The Defendant distinguishes the decision in Attorney General v. M.C.K., Inc., 432 Mass. 546, 736 N.E.2d 373 (2000), because that case involved "the authority of a receiver appointed by the Superior Court under G.L. c. 111, § 72R (the so-called Patient Protector Receivership Act [Act]), to sell a nursing home which has been placed under court supervision, because financial responsibility for the home was disclaimed by the owner, and the home's residents were endangered." Id. at 547.  Moreover, the Defendant argues that courts only may disregard the corporate form in very limited circumstances, citing Evans v. Multicon Constr. Corp., 30 Mass. App. Ct. 728, 732, 574 N.E.2d 395, 398 (1991). The Defendant adds that pervasive control of two corporations by a single owner, without more, does not constitute a sufficient basis to ignore corporate formalities, particularly in the absence of a fraudulent purpose.

**IV. DISCUSSION**

Through his Complaint, the Trustee asks this Court to disregard the distinction between the Debtor and the Defendant so as to make the Defendant's assets available to satisfy the Debtor's creditors.  Specifically, he asks the Court to declare that the My Bread Baking factors have been satisfied and that the assets of the Defendant, including but not limited to the Property, be deemed property of the Debtor's bankruptcy estate, subject to liquidation to satisfy the obligations of the Debtor.  The Court concludes that what the Trustee, in fact, is requesting is the substantive consolidation of the assets of the Debtor and the non-debtor Defendant, although he does not reference that equitable remedy. He is not seeking to pierce the corporate veil of the Defendant to hold Cameron, who was the manager and 99.9% owner of the Defendant liable for the debts of the Debtor.

10

The distinction is important because in My Bread Baking, the Supreme Judicial Court considered "[t]he circumstances in which one corporation, or a person controlling it, may become liable for the acts or torts of an affiliate or a subsidiary under common control . . . ." It stated:

> *Although common ownership of the stock of two or more corporations together with common management, standing alone, will not give rise to liability on the part of one corporation for the acts of another corporation or its employees, additional facts may be such as to permit the conclusion that an agency or similar relationship exists between the entities.* Particularly is this true (a) when there is active and direct participation by the representatives of one corporation, apparently exercising some form of pervasive control, in the activities of another and there is some fraudulent or injurious consequence of the intercorporate relationship, or (b) when there is a confused interminingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting. In such circumstances, in imposing liability upon one or more of a group of 'closely identified' corporations, a court 'need not consider with nicety which of them' ought to be held liable for the act of one corporation 'for which the plaintiff deserves payment.' See W. W. Britton, Inc. v. S. M. Hill Co., 327 [M]ass. 335, 338-339, 98 N.E.2d 637, 639.

My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614, 619, 233 N.E.2d 748, 751–52 (1968)(emphasis supplied).[6]

---

[6] The court In Evans v. Multicon Constr. Corp., 30 Mass. App. Ct. 728, 574 N.E.2d 395 (1991), observed that the My Bread Baking criteria were distilled by the United States Court of Appeals for the First Circuit in Pepsi–Cola Metropolitan Bottling Co. v. Checkers, Inc., 754 F.2d 10, 14–16 (1st Cir.1985), as follows:

> (1) common ownership; (2) pervasive control; (3) confused intermingling of business activity assets, or management; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporate assets by the dominant shareholders; (10) nonfunctioning of officers and directors; (11) use of the

11

In <u>Helena Chem. Co. v. Circle Land and Cattle Corp. (In re Circle Land and Cattle Corp.)</u>, 213 B.R. 870 (Bankr. D. Kan. 1997), the court observed that "[s]ubstantive consolidation should not be confused with either the corporate law concept of piercing the corporate veil or the bankruptcy law concept of joint administration. Unlike piercing the corporate veil, substantive consolidation does not seek to hold shareholders liable for acts of their incorporated entity." <u>Id.</u> at 874 (footnote omitted).  In <u>Butler v. Candlewood Road Partners, LLC (In re Raymond)</u>, 529 B.R. 455 (Bankr. D. Mass. 2015), this Court discussed the relationship between veil piercing, reverse veil piercing and substantive consolidation, stating:

> In Massachusetts, piercing the corporate veil is a well-recognized, yet fact specific, remedy. *See* <u>Zimmerman v. Puccio</u>, 613 F.3d 60, 74 (1st Cir. 2010); <u>My Bread Baking Co. v. Cumberland Farms, Inc.</u>, 353 Mass. 614, 620, 233 N.E.2d 748 (1968). In addition, Massachusetts courts hold that "the corporate veil will only be pierced in rare situations." <u>Birbara v. Locke</u>, 99 F.3d 1233, 1239 (1st Cir. 1996). In <u>Riley v. Tencara, LLC (In re Wolverine, Proctor & Schwartz, LLC)</u>, 447 B.R. 1 (Bankr.D.Mass.2011), this Court observed that "[a]lthough the standards for piercing the corporate veil are articulated most frequently with respect to corporations, . . . the same principles would apply for alter ego liability to attach to members of limited liability companies." <u>Id.</u> at 36 (citing <u>In re Giampietro</u>, 317 B.R. 841, 847–48 and n. 9 (Bankr. D. Nev. 2004)). *See also* <u>Rodrigues v. Osorno (In re Osorno)</u>, 478 B.R. 523, 536 (Bankr.D.Mass.2012).

---

corporation for transactions of the dominant shareholders; (12) use of the corporation in promoting fraud.

<u>Evans v. Multicon Constr. Corp.</u>, 30 Mass. App. Ct. at 733, 574 N.E.2d at 398.

In re Raymond, 529 B.R. at 475.  In Raymond, this Court referenced Logistics Information Sys., Inc. v. Braunstein (In re Logistics Information Sys., Inc.), 432 B.R. 1 (D. Mass. 2010), in which the district court stated:

> Bankruptcy courts may substantively consolidate two or more related entities and thereby pool their assets. Substantive consolidation "treats separate legal entities as if they were merged into a single survivor left with all the cumulative assets and liabilities." Genesis Health Ventures, Inc. v. Stapleton (In re Genesis Health Ventures, Inc.), 402 F.3d 416, 423 (3d Cir. 2005). . . . Substantive consolidation of two or more debtors' estates is widely accepted. *See, e.g.*, In re Owens Corning, 419 F.3d 195, 207 (3d Cir. 2005); In re Bonham, 229 F.3d 750, 764 (9th Cir. 2000); Reider v. Fed. Deposit Ins. Co. (In re Reider), 31 F.3d 1102, 1106–07 (11th Cir. 1994); Drabkin v. Midland–Ross Corp. (In re Auto–Train Corp.), 810 F.2d 270, 276 (D.C. Cir. 1987). Substantive consolidation of a non-debtor with a debtor, as here, is less common, but increasingly accepted. The trend toward greater court approval of substantive consolidation "has its genesis in the increased judicial recognition of the widespread use of interrelated corporate structures. . . ." Eastgroup Props., 935 F.2d at 249 (quoting In re Murray Indus., Inc., 119 B.R. 820, 828–29 (Bankr. M.D. Fla. 1990)). "Without the check of substantive consolidation, debtors could insulate money through transfers among inter-company shell corporations with impunity." In re Bonham, 229 F.3d at 764.
>
> * * *
>
> Within this circuit, bankruptcy courts have approved the application of substantive consolidation to non-debtors, often in cases in which the non-debtor is a subsidiary or alter ego of the debtor. *See, e.g.*, Gray v. O'Neill Props. Group, L.P. (In re Dehon, Inc.), No. 02–41045, 2004 WL 2181669, at *3 (Bankr. D. Mass. Sept. 24, 2004) ("Large corporations, such as the Debtor, often use multi-tiered corporate structures, and substantive consolidation has been used to reach the assets and liabilities of a non-debtor subsidiary corporation."); Murphy v. Stop & Go Shops, Inc. (In re Stop & Go of Am., Inc.), 49 B.R. 743, 745 (Bankr. D. Mass. 1985).

In re Logistics Info. Sys., Inc., 432 B.R. at 10–12 (footnote omitted).  *But see* The Official Comm. of Unsecured Creditors v. The Archdiocese of St. Paul and Minneapolis, No. 16-2712 ADM,2016 WL 7115977 (D. Minn. Dec. 6, 2016)(substantive consolidation cannot be

used to circumvent 11 U.S.C. § 303(a) in the case of charitable organizations); In re Pearlman, 462 B.R. 849 (Bankr. M.D. Fla. 2012)("allowing substantive consolidation of non-debtors under § 105(a) circumvents the stringent procedures and protections relating to involuntary bankruptcy cases imposed by § 303 of the Bankruptcy Code").

In Woburn Assocs. v. Kahn (In re Hemingway Transp., Inc.), 954 F.2d 1 (1st Cir. 1992), the First Circuit noted:

> Consolidation is permitted only if it is first established that the related debtors' assets and liabilities are so intertwined that it would be impossible, or financially prohibitive, to disentangle their affairs. The trustee may request consolidation to conserve for creditors the monies which otherwise would be expended in prolonged efforts to disentangle the related debtors' affairs. Nevertheless, the bankruptcy court must balance the potential benefits of consolidation against any potential harm to interested parties.

In re Hemingway Transp., Inc., 954 F.2d at 11 n.15 (citations omitted). The First Circuit in Hemingway added that because "[substantive] consolidation can cause disproportionate prejudice among claimants required to share the debtors' pooled assets, the party requesting substantive consolidation must satisfy the bankruptcy court that, on balance, consolidation will foster a net benefit among all holders of unsecured claims." 954 F.2d at 11–12 (footnote omitted).

While noting that the First Circuit specifically has approved substantive consolidation of multiple debtors, but not substantive consolidation involving non-debtors, the court in Logistics Information Sys., Inc., 432 B.R. at 11, observed that the test adopted by the First Circuit in Hemingway is similar to the test set forth in Drabkin v. Midland–Ross Corp. (In re Auto–Train Corp.), 810 F.2d 270, 276 (D.C. Cir. 1987), in which the District of Columbia Circuit considered the following factors, all of which must be

14

satisfied: "(1) the movant must show a 'substantial identity between the entities to be consolidated;' (2) the movant must also demonstrate that 'consolidation is necessary to avoid some harm or to realize some benefit;' and (3) if a creditor will be prejudiced, the benefits of consolidation must heavily outweigh the harm." Logistics Information Sys., Inc., 432 B.R. at 12. The Logistics court also observed that the bankruptcy court, while employing the Auto-Train test, also considered substantive consolidation with reference to the standard for piercing the corporate veil. Id. (citing, inter alia, Aoki v. Atto Corp. (In re Aoki), 323 B.R. 803, 812 (B.A.P. 1st Cir. 2005), in which the court applied the factors set forth in My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614, 233 N.E.2d 748, 752 (1968)).

The Court concludes, based upon the weight of the evidence, that the Trustee has sustained his burden of proof. The Court determines that he has satisfied the test adopted by the Court in Hemingway, 954 F.2d at 12 n.15, which mirrors the Auto-Train test. *See* 810 F.2d at 276. The Court observes that, although the Debtor and the Defendant did maintain a certain degree of separateness and observed some corporate formalities, such as filing separate tax returns, separate annual reports, and issued separate W-2 statements for employees, they disregarded corporate formalities in several respects.

The Trustee demonstrated that there is a "substantial identity between the entities to be consolidated." The common ownership and control of the Debtor and the Defendant by Cameron are admitted facts. The Debtor initially contributed $12,000 of capital for a 1% interest in the Defendant, whereas Cameron's contribution of $108,000 for a 99% interest in the Defendant was disproportionate. The capital structure was unfair to the

15

Debtor, which should have been entitled to a greater percentage of ownership in the Defendant given its 10% capital contribution.

The Defendant did not engage in business in accordance with its business purpose as set forth in its Operating Agreement and Annual Report. Its business went beyond the ownership, management and development of real estate. The Defendant's seventeen employees worked exclusively for the Debtor in performing services in the Debtor's business during 2011, 2012 and 2013. Thus, the work of the Defendant's employees was outside the scope of the stated business purpose of the Defendant's business as a real estate holding company. There was no formal sharing arrangement for the services provided by the Defendant's employees to the Debtor.

The Debtor and the Defendant also did not have a written lease for the premises occupied by the Debtor. Funds were paid by the Debtor to the Defendant and denominated rent, but those amounts varied from year to year. The funds paid as "rent" were booked as payment of the work performed by the Defendant's employees.

The Trustee also demonstrated that a benefit would be realized where the Defendant has de minimis debt relative to the value of the Property. Thus, consolidation is necessary to realize a benefit to the Debtor's bankruptcy estate, particularly where it is unlikely that any creditor of the Defendant would be prejudiced and the benefits of consolidation heavily outweigh the harm. In addition, the veil piercing factors referenced in My Bread Baking, 353 Mass. at 619-20, 233 N.E.2d at 752, and its progeny support substantive consolidation. The evidence established that there was common ownership of the Debtor and the Defendant by Cameron, who controlled the two entities and there

16

was intermingling assets. The Debtor was thinly capitalized, and the two entities observed only minimal corporate formalities by filing separate tax returns and Annual Reports. There was no evidence of other corporate record keeping or payments of dividends. Moreover, the Trustee has commenced another adversary proceeding against the Defendant and Cameron's spouse, seeking, among other things, the recovery of excessive salary paid by the Debtor to the Defendant for the benefit of Cameron's spouse. That action has been stayed pending the conclusion of this adversary proceeding.

## V. CONCLUSION

In view of the foregoing, the Court shall enter a judgment in favor of the Trustee and against the Defendant.

By the Court,

*Joan N. Feeney*

Joan N. Feeney
United States Bankruptcy Judge

Dated: December 14, 2016